Filed 12/9/15  P. v. Delgado CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B252021 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA116982) |
| v. | |
| RICARDO ISAAC DELGADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas I. McKnew, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendant Ricardo Isaac Delgado appeals from a judgment of conviction entered after a jury trial. The jury convicted Delgado of five counts of committing a lewd act on a child under age 14 (Pen. Code, § 288, subd. (a)) and two counts of committing a lewd act on a child age 14 or 15 (*id*., subd. (c)(1)). The trial court sentenced Delgado to concurrent terms of 15 years to life on the first five counts, plus a determinate term of 4 years for the latter two counts.

On appeal, Delgado takes issue with the trial court's evidentiary rulings concerning the impeachment of witnesses. More specifically, he claims the trial court erred in (1) sanitizing the felony convictions of all witnesses, (2) not allowing impeachment of a prosecution witness with her prior misdemeanor convictions while allowing Delgado to be impeached with his prior misdemeanor conduct, (3) excluding a prior claim of rape by a prosecution witness, and (4) ruling that a defense witness could be impeached with prior convictions of crimes involving moral turpitude. We find no abuse of discretion in the trial court's evidentiary rulings and affirm.

## FACTUAL BACKGROUND

### A. *Prosecution*

#### 1. *Introduction*

Delgado met Leslie B. in 1996 or 1997. Leslie had two daughters: A., who was born in 1990, and S., who was born in 1996. As children, A. lived with her grandparents and S. lived with her father.

Delgado and Leslie had a daughter, L., who was born in 2000, and a younger son. Delgado and Leslie married in 2006.

Leslie struggled with methamphetamine addiction most of her adult life. She had committed numerous crimes, been convicted of many felonies, and been in jail or prison multiple times.

Leslie was in prison from October 2008 through February 2010. She was again convicted of felonies in 2012 and began a jail sentence in August 2012.

2. *Crimes Against A.*

In 2001 and 2002, when A. was 12 years old, A. visited Leslie and Delgado at their home in Bell Gardens. During one of those visits, A. was alone with Delgado in the living room after Leslie had gone to bed. Delgado pulled A. on top of him, so that she was straddling him, and inserted his penis in her vagina. She felt "ripping on the inside." The next morning she was still in pain and saw bruises, and she subsequently suffered from a bladder infection. She did not tell anyone about the incident because she was afraid of Delgado.

In 2004 and 2005, when A. was 14 years old, there was one occasion when she and Delgado were in the garage together, and he reached toward her breasts and touched her. When she "freaked out," he told her that he was trying to rub her shoulders. On several other occasions, Delgado grabbed A.'s buttocks. One time he joked that he grabbed A. thinking that she was Leslie, but A. did not believe him. She was terrified of him and did not say anything about the incidents.

Anthony Barela began dating A. in 2008. She told him that "things happened that she was scared to tell anybody about," because Delgado "had told her that if she ever said anything that he would kill her mother[, Leslie]." In 2009, A. told Barela that Delgado had raped her, and she eventually described what had happened. She was shaking and crying. She made Barela swear not to tell anyone about it.

3. *Crimes Against S.*

In 2003, when S. was seven years old, she visited Leslie and Delgado at their home. She sometimes slept between Leslie and Delgado in their bed. Once, while Leslie was asleep, Delgado reached under S.'s nightgown and underpants and rubbed her vagina.

3

At another time when S. was in bed with Leslie and Delgado, he grabbed S.'s hand and put it on his penis. When she realized what she was touching, she closed her hand so she would not have to touch it anymore.

On another occasion, when S. was between seven and nine years old, she and Delgado were in a van in traffic. Delgado reached over and put his hand in S.'s pants. She attempted to get away from him by crouching down on the floor.

S. did not tell anyone about these incidents because she was disgusted and embarrassed by them. When she was 13 or 14 years old, S. required a physical examination in order to participate in sports at school. She had to fill out a form that asked whether she had ever been forced or pressured to have sex; she checked the box for "yes." She subsequently spoke to law enforcement officers about the incidents with Delgado.

4. *Crimes Against L.*

In 2009 and 2010, when L. was nine years old, she lived with Delgado in Norwalk while Leslie was in prison. On one occasion, Delgado hit L. on her bare buttocks with a leather belt. L. was in pain for about two days.

One night, L. went to Delgado's bedroom at about 2:00 a.m. because she had a bad dream and was afraid of ghosts. She got into bed with him. Delgado pushed her close to him in a way that made her uncomfortable. He reached under her underwear and rubbed her vagina. L. was scared. The next day, Delgado told L., "You know what would happen if you tell on me." L. believed he meant that something bad would happen.

L. did not tell anyone what happened because she believed Delgado would do something to hurt her or Leslie. She was afraid of him, because she had seen him hit Leslie in the past and make her bleed. L. did not say anything to Leslie about the incidents after Leslie was released from custody because she did not want anything bad to happen.

4

At some point after Leslie was released from custody, she and L. were living in a motel in Orange County. Leslie was arrested at the motel and jailed. After her release, she and L. moved into a domestic violence shelter.

On August 3, 2010, L. was living with A. and A.'s father in Huntington Beach. L. found out that a court had ordered her returned to Delgado's custody. She began to cry and told A. that she would rather kill herself than live with Delgado. A. called 911 and reported that L. had threatened to kill herself if she had to go back to Delgado.

An emergency meeting at the Department of Children and Family Services (Department) was held the following day. L. and Leslie attended, as well as Delgado's daughter from a previous marriage, Brianna. L. first described physical abuse by Delgado. L. did not say that she was molested because she was afraid Brianna would tell Delgado, and he would hurt L. After the meeting, L. was placed in foster care. L. eventually told another social worker about the molestation so she would not be returned to Delgado.

5. *The Investigation*

On September 10, 2010, Detective Rudy Acevedo of the Los Angeles County Sheriff's Department interviewed S. at her home. S. described three incidents of molestation: Once she went into Delgado's bedroom when she had a bad dream; as she was sleeping between Delgado and Leslie, Delgado put his hand under her clothes and rubbed her vagina. The same thing happened a second time, but Delgado took her hand and tried to force her to touch his penis; she closed her hand to avoid touching it. The third time was when they were driving in traffic and he reached over, put his hand inside her underwear, and rubbed her vagina. She "scooted down" to the floor to escape him. All three incidents occurred when she was seven or eight years old.

Acevedo interviewed L. on September 13, 2010. L. appeared nervous and started to cry when the detective asked her about Delgado. L. told him that Delgado was mean to her and disciplined her harshly. Once he pulled her pants down and spanked her on her bare bottom with a belt. This caused welts and bruises, and she could not sit down

5

for several days or a week. L. also described violent conduct between Delgado and Leslie. Acevedo asked L. about the molestation, and she told him, "I can't talk about that. I'm afraid he's going to kill me or my mother." L. eventually told Acevedo that once she went to Delgado's bedroom after having a bad dream. Delgado rubbed the sides of her pelvic area, then put his hands on her vagina and rubbed it. He then told her, "You better not tell anybody."

Acevedo interviewed A. on September 20, 2010. Once he started asking her about Delgado, A. became panicky; she was shaking and crying and had difficulty breathing. She told him she was unable to talk about what happened and needed counseling.

Based on the interviews with S. and L., Acevedo caused Delgado to be arrested on September 24, 2010. Acevedo re-interviewed S. and L., and they gave statements similar to their previous ones. He also telephoned A. and told her that Delgado had been arrested and his bail was $2 million. She agreed to meet with him.

Acevedo met with A. on September 27, 2010. A. told him that when she was in the living room watching television, Delgado came in, picked her up and placed her on his penis. It was very painful, and she was ripping and tearing inside. The next morning she felt very sore and had bruises inside her thighs. Later that week, she had a urinary tract infection. During the interview, A. was shaking and crying, and Acevedo believed it was very difficult for her to talk about what happened.

6. *Expert Testimony*

Sergeant Daniel Scott of the Los Angeles County Sheriff's Department had worked with the Special Victims Bureau for 25 years and testified as an expert witness. He testified that it is rare for a child to tell anyone immediately after being molested. A child may delay disclosure of molestation for months or years. This may be due to fear of retaliation, blame and isolation. If the molester had exhibited a pattern of violence in front of the child, this would contribute to the child's failure to disclose the molestation.

Scott testified that, based on his experience, there is no typical way for a child to react to molestation. Children do not remember time like an adult, and it is common for children to give inconsistent reports of molestation.

Scott did not know anything about this particular case. He had not read any of the reports or spoken to anyone about the case.

7. *Additional Evidence*

In 2004,[1] Delgado used his van to ram Leslie's car while she and L. were inside. He screamed at Leslie and stomped on the hood of the car. When she tried to run away, Delgado grabbed the back of her jacket and tore it. He was arrested.

On July 13, 2010, after having been absent from the Norwalk home he shared with Leslie for two weeks, Delgado returned home. The locks on the house had been changed because Leslie was afraid of him. Delgado was upset that the locks had been changed and he attempted to kick in the door. A.'s boyfriend stood by at the door and told A. to take the children in the home into another room and call Leslie. Delgado managed to enter the house, holding a screwdriver. A.'s boyfriend did not try to stop Delgado, because he thought Delgado might try to stab him with the screwdriver. Delgado grabbed the children out of the other room, and A. called 911.

Leslie rushed home in response to A.'s call. When she arrived, she saw Delgado attempting to drag the children out of the house. The children screamed and ran to Leslie. The children then got into Leslie's car, and she attempted to shut the door after them. Delgado grabbed the car door and forced Leslie into the corner of the door. He raised the screwdriver above his head and Leslie screamed, believing she was about to die. Instead, Delgado punctured all four of her tires and threw her keys away.

Another time, A.'s boyfriend tried to intervene during an argument between Delgado and Leslie. He told them that they should calm down because the children were

---

[1]    Leslie could not remember exactly when this incident occurred and testified it may have been in 2003.

present.  Delgado ignored him, yelling at Leslie and pushing her against a wall.  When A.'s boyfriend begged him to stop fighting in front of the children, Delgado told him, "Don't . . . tell me how to run my . . . family.  Get the hell out of here."  Delgado then challenged A.'s boyfriend to a fight.

Leslie denied knowing anything about what Delgado had done to A. or S. until September 2010, when he was arrested.  She also denied telling the girls to make up molestation claims against Delgado in order to help L. get away from him.  She said she would not do that and put a child through the turmoil of testifying about a sexual assault in front of a room full of strangers.

S. testified that she would not lie to help either Leslie or L.  A. testified that she would not lie for Leslie, and she doubted if Leslie would lie for her.  She acknowledged, however, that when she was 15 Leslie helped her get a false identification card so she could get into casinos and drink in Las Vegas.  A. also testified that she would not fabricate allegations of sexual abuse by Delgado in order to help L.

While Delgado was in custody, he wrote love letters to Leslie.  He wrote about his memories of their love.  He made a notation of bible verses, 1 Corinthians 7:10-11, commanding a wife not to leave her husband and, if she does leave, to remain unmarried or be reconciled to her husband.

Delgado also made telephone calls to his first wife, Lynette, from jail.  These calls were recorded.  He told Lynette that she needed to talk to their 14-year-old daughter, Brianna, because "she is the only one that could . . . convince [L.] to change her . . . story. [Brianna] needs to because [L.] is sticking to her guns . . . ."

## B. *Defense*

### 1. *Delgado's Testimony*

Delgado never molested A., S., or L.  He testified that A. visited his home in 2002, but she never spent the night there.  S. never slept in the same bed with him and Leslie. He once drove S. to her father's home in his car; he did not use his van because her father

8

lived some distance away and the van used too much gas.  L. came into his room and slept with him five or six times while Leslie was in prison.

Delgado admitted that during a jailhouse telephone conversation with Lynette, he talked about getting L. to change her story.  He did this because L.'s story was a lie.

When Delgado lived with Leslie, they occasionally argued.  He got into an altercation with her in 2004 that resulted in him being jailed.  Leslie bailed him out of jail later that day.  According to Delgado, he did not ram Leslie's car with his van.  Rather, he blocked her car from leaving because she was drunk and was taking L.  He did not damage her car or chase after her.  The police sprayed him with pepper spray while he was trying to protect L.[2]

On cross-examination, Delgado acknowledged that in the past he had used different social security numbers and had given law enforcement a different name. However, he considered himself to be a mostly truthful and honest person.

2. *Delgado's Family Members*

Brianna testified that Delgado never struck or molested her.  In her opinion, he was an honest person.  Brianna recalled an incident in which Delgado attacked Leslie's car with a screwdriver, but she never saw him use the screwdriver to attack a person.

Samantha C. was Delgado's stepdaughter.  He began taking care of her when she was two years old.  Delgado never did anything to Samantha "physically," and she believed him to be truthful and honest.  Samantha spent time with L. in 2009 and 2010. L. never told Samantha that Delgado had molested her.

Delgado's sister, Elizabeth Boland, testified that he had a good reputation for honesty.

---

[2]     The parties stipulated during trial that on March 25, 2004, Delgado pled no contest to misdemeanor domestic violence (Pen. Code, § 273.5) and endangering a child (*id*., § 273) based on this incident.

3. *Other Witnesses*

Lisa Alford was a social worker for the Department. When she interviewed A., A. did not say she had been molested. When she interviewed L., L. said Delgado cursed at her, made her do the dishes and called her stupid. L. said she reported the molestation to an afterschool program teacher, Jacqueline Ramirez. Teachers are required by law to report child molestation. Alford could find no such report by Ramirez.

Ramirez testified that L. was one of her former students. L. never told her about any molestation.

Dr. Melanie Blumenthal was L.'s doctor from February to August 2010. L. never told the doctor about any molestation.

Los Angeles County Deputy Sheriff Raymond Ybarra spoke to L. on August 4, 2010 at the Department office. L. denied that Delgado ever hit her. She said he spanked her when she misbehaved.

Marianna Yamamoto, a dependency investigator for the Department, spoke to L. on August 11, 2010. L. was tearful and anxious. She said she wanted to live with Leslie, not with Delgado. L. told Yamamoto that Delgado had fondled her once, on top of her clothing. Yamamoto also spoke to S., who said Delgado had touched her "private area" while she slept between him and Leslie.

San Bernardino County Deputy Sheriff Randy Rouse interviewed S. on August 25, 2010. S. said that Delgado touched her between 5 and 10 times; she was not certain how many. They occurred at home, in Delgado's van, and when she was in bed with Delgado and Leslie.

Buena Park Police Detective Christopher Nyhus spoke to Leslie on July 21, 2010. In the course of a search, he found a glass pipe used to smoke methamphetamine. Leslie said the pipe did not belong to her. She said she had smoked methamphetamine in the past but had quit and had not used it in about a month.

4. *Expert Testimony*

Dr. Ronald Markman, a psychiatrist, evaluated Delgado to determine whether he had a psychiatric condition that made him a potential danger to society, and whether he

had a predilection for sexual misconduct with children. It was Markman's opinion Delgado did not suffer from a major axis one psychiatric condition, which would include schizophrenia, bipolar disorder, manic depressive disease, or anxiety disorders. Based on the testing done, Markham found "there is not enough data to firmly conclude that there was or there was not sexual misconduct."

## DISCUSSION

### A. *Restriction of Delgado's Impeachment of Leslie*

Delgado and Leslie both had prior felony and misdemeanor convictions. Delgado contends the trial court erroneously restricted his impeachment of Leslie to her prior felony convictions, while allowing him to be impeached by both his prior felony and misdemeanor convictions. He claims this disparate treatment violated his Sixth and Fourteenth Amendment rights to confront witnesses against him, present a defense, and to a fair trial. As we discuss below, the trial court's evidentiary rulings as to impeachment were correct and did not violate Delgado's constitutional rights.

#### 1. *Proceedings Below*
##### a. *Pretrial Proceedings*

Prior to trial, the prosecutor raised the issue of Leslie's impeachment with her prior convictions. First was a conviction of possession for sale of a controlled substance. The trial court ruled the defense could elicit evidence "she was convicted of a crime involving moral turpitude. The point is . . . do not . . . indicate what the crime is." The court made the same ruling for a 2000 conviction for possession for sale, 2010 convictions for possession of controlled substances and welfare fraud, and 2011 convictions for 14 counts of fraud and perjury.

The defense wanted to introduce evidence of Leslie's July 21, 2010 arrest, and that after she was released from jail, she "became aware of the investigation by the [Department] about her drug usage." The trial court ruled that if Leslie was convicted,

11

defense counsel could refer to her conviction. Otherwise, the evidence was inadmissible. Defense counsel objected that the evidence was "a very big part of [the] defense." The trial court responded, "You can present it otherwise. Just—I'm not saying that you can't cross-examine her about it. You can." The same was true of evidence "Leslie . . . was ordered to return to [the] probation office but didn't appear" after her release.

### b. *Direct Examination of Leslie*

During Leslie's direct examination, while the prosecutor was questioning her as to why she returned to Delgado after the car-ramming incident, defense counsel requested a sidebar. Defense counsel stated, "Your honor, I thought that we're going to talk about convictions and not go into these cases at length. This particular case occurred in 2004. It was a misdemeanor. I will admit the misdemeanor. I am objecting to the facts of the case, otherwise I think this court's going to hear a lot of witnesses on both sides and— he's charged with child molesting. I can see the relevancy [of] him being convicted in a moral turpitude crime, but to go into every—if that's the case—if the court wants me, I can go into every fact of everything that she's ever done."

The trial court reiterated: "Look. We're not going to have any testimony as to the crimes that were committed either by Leslie . . . or by [Delgado]." Both could be impeached with prior felony convictions involving moral turpitude. "But, on the other hand, you're not to discuss or ask questions or elicit answers of what either Leslie . . . or [Delgado] were found guilty of." The trial court stated that the ruling reflected a balance struck by the court.

Defense counsel asked to have an Evidence Code section 402 hearing on the issue of Leslie's felony convictions. The trial court stated that it had already held such a hearing but allowed defense counsel to make a record. Defense counsel explained that after Leslie went to jail on June 30th, 2010, she learned of 14 felony charges against her for welfare fraud, grand theft and perjury. Defense counsel believed he had "a right to disclose these thefts and perjuries because" in pleading guilty, Leslie admitted she was a thief and a liar. The trial court stated that it had already ruled on the matter, and its ruling

12

was going to stand; defense counsel could not refer to the specific offenses. However, the court would allow defense counsel to question Leslie regarding certain of her handwritten notes, which he argued constituted admissions that she was a liar and a thief.

### c. *Cross-Examination of Leslie*

During cross-examination, defense counsel asked Leslie if she was convicted of a misdemeanor on July 21, 1997. The prosecutor's objection was sustained. Defense counsel attempted to ask Leslie about felony convictions, but the prosecutor's objections were sustained on the ground the information was to be provided to the jury by stipulation. In a conversation outside the presence of the jury, the trial court reiterated that "we're not going to talk about the misdemeanors." Defense counsel protested that it was a conviction of petty theft, which is a crime of moral turpitude. The trial court again stated that it was not going to allow impeachment with misdemeanors, only felonies.[3]

Defense counsel requested that he be allowed to impeach Leslie with convictions of possession for sale of a controlled substance. The prosecutor sought to exclude the convictions because they were more than 10 years old, but the trial court stated that it would allow the impeachment. Defense counsel also agreed to a stipulation that Leslie sustained three felony convictions prior to 2001. The court noted that "in addition to that,

---

[3]     Delgado does not clearly distinguish here (and did not do so in the trial court) between impeachment by the fact of conviction versus the underlying misdemeanor conduct. The prosecutor was clear throughout that she intended to impeach by eliciting testimony about the conduct underlying the misdemeanor convictions. The prosecutor repeatedly referenced conduct and not convictions. The prosecutor began her cross-examination of Delgado not by asking him about misdemeanor convictions, but instead whether he had given a false name to law enforcement and used four other people's social security numbers. In the trial court, Delgado's counsel never distinguished between conduct and convictions and referred generally only to misdemeanors. Delgado's counsel argued that the court did not permit him the same latitude as the prosecutor. The court, however, merely excluded evidence of the misdemeanor conviction and not the underlying conduct. The misdemeanor conviction the jury did learn of was pursuant to the parties' stipulation.

13

the parties have agreed that prior to 2002 that [Leslie] sustained three felony convictions, . . . and that in 2007 [she] also sustained a felony conviction."

Defense counsel later cross-examined Leslie about her arrest at the Orange County motel, when L. was present with her. During a break in the proceedings, defense counsel stated that he was "laying a foundation for impeachment. . . . I'm not going into her convictions." He wanted to impeach her with evidence she lied to the police officer when she said she was not currently using drugs. The trial court ruled that defense counsel could question Leslie about the incident to determine whether she lied to the authorities, and he could mention the arrest insofar as it was necessary to provide background information. However the court would admonish the jury that "[a] mere arrest in this case has no bearing on [Leslie's] truthfulness."[4]

### d. *Defense Case*

Prior to presentation of the defense case, the prosecutor stated that when Delgado's "character witnesses do testify, I intend to impeach them. Impeach them with statements they've made. And also I'm permitted to go into misdemeanor conduct of [Delgado]. Not the fact of conviction, but misdemeanor conduct. I wanted to explicitly say that that's in the code." Defense counsel objected that he had not "been able to do

---

[4]     The court then instructed the jury: "An arrest in and of itself is not any evidence of misconduct or evidence that can be used to test the veracity, the truthfulness, of a witness. Convictions that involve moral turpitude can be used as a consideration by you, if you wish to, for impeachment purposes. "Now, back to the time frame where—in some time around June 30th, 2010, there is evidence that [Leslie and L.] . . . were living in the Red Roof Inn . . . and that she was arrested, she's testified outside of the room. Now, the fact that she's arrested cannot be considered by you at all. And if she's charged and even convicted of a crime that doesn't involve moral turpitude, you can't consider that for impeachment purposes either. However, if the testimony should be and may not be—we haven't heard it as yet—that she may have lied to a government official and then later told another story, it can be considered along with all the circumstances under which it was told, of which you should consider whether or not under the circumstances it really matters for impeachment purposes to you or it doesn't."

14

that on misdemeanors as to character of Leslie . . . . I've been told and informed that you're not talking about anything but felonies by this court."

The trial court stated that it did not know what the prosecutor intended to prove, and reiterated that it would not allow impeachment with misdemeanor offenses. The court added that if the conduct "is far more prejudicial than it is probative I can always fall back on that and that's my call."

During presentation of the defense case, defense counsel told the court that before he decided whether to call Delgado as a witness, he wanted to find out what information about Delgado's past the prosecution intended to cover. The prosecutor told the court that she would be asking Delgado about the "underlying conduct of misdemeanors of moral turpitude," including assault, grand theft, violating a restraining order and giving false information to the police, "which are crimes of moral turpitude."

Defense counsel protested that the trial court did not allow him to impeach Leslie with misdemeanors involving moral turpitude but only with felonies. The trial court explained, "This is different. This is the defendant testifying. And if the crimes are crimes involving moral turpitude, whether misdemeanors or felonies, you're able to mention the crime. We're not going to go into any detail about the crime." The court then agreed with the prosecutor that she could ask about "the underlying circumstances of the misdemeanor" if it involved Leslie or another witness, as long as the crime involved moral turpitude. However, it would exercise its discretion to exclude such evidence if an incident "was so far back in time as in the court's view not to be relevant."

At the start of the prosecutor's cross-examination of Delgado, she asked him whether he "ever used any other name to law enforcement" and "ever used at least four other people's social security numbers in your past." Delgado responded that he had.

During redirect, outside of the presence of the jury, the prosecutor brought up the issue of Delgado's no contest plea to misdemeanor committing corporal injury to a spouse. When defense counsel protested, the prosecutor responded that Delgado "lied on the stand and denied that he even did anything, but yet he [pled] to it." Despite defense counsel's reservations based upon the court's limitations on Leslie's impeachment,

15

counsel agreed to stipulate to a no contest plea to a domestic violence charge. Defense counsel then stipulated in front of the jury "that the defendant [pled] no contest to misdemeanor domestic violence, Penal Code section 273.5, corporal injury to spouse, cohabitant or child's parent, and that he also [pled] no contest in the same information, same case, to endangering a child, a violation of Penal Code section 273[, subdivisions] (a) [and] (b) . . . in 2004."

2. *Admission of Prior Felony Convictions for Impeachment Purposes*

In general, "'[t]he trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes . . . . The discretion is as broad as necessary to deal with the great variety of factual situations in which the issue arises, and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded.' [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 887.)

The California Constitution "'provides in pertinent part that "[a]ny prior felony conviction . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding."' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 723; see Cal. Const., art. I, § 28, subd. (f).) The Supreme Court has held that this provision ""'authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty."' [Citation.]" (*Edwards*, *supra*, at pp. 723-724.) However, admission of a prior felony conviction for impeachment purposes is subject to the trial court's exercise of discretion under Evidence Code section 352. (*Edwards*, *supra*, at p. 723.)

"'The scope of inquiry when a criminal defendant is impeached with evidence of a prior felony conviction does not extend to the facts of the underlying offense.' [Citation.]" (*People v. Shea* (1995) 39 Cal.App.4th 1257, 1267; see *People v. Edwards*, *supra*, 57 Cal.4th at pp. 721, 723.) The trial court may exercise discretion and "sanitize" the prior convictions, i.e., allow impeachment with felonies involving moral turpitude without allowing the jury to know the specific crimes resulting in the convictions. (See

16

*People v. Sandoval* (1992) 4 Cal.4th 155, 177-178; *People v. Mickle* (1991) 54 Cal.3d 140, 172; *People v. Ballard* (1993) 13 Cal.App.4th 687, 696.)

The record shows that, with respect to prior felony convictions, the trial court ruled as to all witnesses the fact and number of prior felony convictions involving moral turpitude would be admissible for impeachment purposes. This was permissible, and Delgado does not specifically challenge this ruling.

Moreover, both Leslie's and Delgado's prior felony convictions involving moral turpitude were admissible for impeachment purposes, and the trial court did not abuse its discretion in ruling them admissible. (*People v. Edwards*, *supra*, 57 Cal.4th at p. 722.) We also perceive no abuse of discretion in the trial court's decision to sanitize Leslie's and Delgado's prior felony convictions. The court's decision reflected the balance that it struck. Because the jury was well aware that Leslie had numerous prior convictions involving moral turpitude, the procedure did not result in Leslie being clothed with a false aura of veracity. (*People v. Chavez* (2000) 84 Cal.App.4th 25, 28; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 927.)


3. *Admission of Prior Misdemeanors for Impeachment Purposes*

"'[I]f past criminal conduct amounting to a misdemeanor has some logical bearing upon the veracity of a witness in a criminal proceeding, that conduct is admissible, subject to trial court discretion . . . .' (*People v. Wheeler* (1992) 4 Cal.4th 284, 295 . . . .) 'When the witness subject to impeachment is not the defendant, those factors [guiding the court's discretion] prominently include whether the conviction (1) reflects on honesty and (2) is near in time.' (*People v. Clair* (1992) 2 Cal.4th 629, 654 . . . .)[5] However, 'the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in

_____

5    By contrast, when determining whether to allow impeachment with a felony conviction remote in time, the prejudice side of the balance is weighted more heavily when the witness being impeached is the defendant. (*People v. Woodard* (1979) 23 Cal.3d 329, 337-338.)

17

individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' (*Wheeler*[, *supra*,] at p. 296.) '"[C]ourts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value."' (*People v. Clark* (2011) 52 Cal.4th 856, 932 . . . .)" (*People v. Leonard* (2014) 228 Cal.App.4th 465, 497.)

One caveat in deciding whether to exclude evidence of misdemeanor conduct is that the exclusion of such evidence should not be allowed to clothe a witness in a false aura of veracity. (*People v. Chavez*, *supra*, 84 Cal.App.4th at p. 28; see *People v. Beagle* (1972) 6 Cal.3d 441, 453; *People v. Gray* (2007) 158 Cal.App.4th 635, 641.) Unquestionably, this was not an issue as far as Leslie was concerned. She was impeached with multiple prior felony convictions. In addition, the trial court allowed the defense to cross-examine her regarding whether she lied to authorities around the time of her arrest in 2010, because that would reflect on her credibility. Thus, despite the ruling that Leslie could not be impeached with prior misdemeanor convictions, the trial court allowed Delgado to examine her conduct which reflected on her veracity.

The trial court stated that it would allow the prosecutor to impeach Delgado with evidence of his conduct amounting to a misdemeanor, but the court indicated that it would exercise its discretion to exclude such evidence if an incident "was so far back in time as in the court's view not to be relevant." The prosecutor briefly questioned Delgado regarding his previous use of false names and social security numbers. She also asked him about his no contest plea to charges of misdemeanor domestic violence and endangering a child after he testified that he did not ram Leslie's car in the 2004 incident. The use of false names and social security numbers was relevant to the issue of credibility. Evidence of his no contest plea was certainly relevant to the credibility of his testimony regarding the 2004 incident.

We find no abuse of discretion in the trial court's rulings regarding impeachment with prior misdemeanor conduct. Both Leslie and Delgado were impeached with prior felony convictions. The trial court allowed both to be impeached with prior conduct

18

which reflected directly on their credibility on the witness stand. The trial court's statement that it was going to make a distinction as to Delgado's testimony when it came to impeachment with prior misdemeanor conduct was a permissible exercise of discretion. (See *People v. Leonard*, *supra*, 228 Cal.App.4th at p. 497.) More importantly, in restricting Leslie's impeachment with prior misdemeanor conduct, the court did not allow Leslie to be given a false aura of veracity (*People v. Chavez*, *supra*, 84 Cal.App.4th at p. 28), as it allowed cross-examination into her credibility.

### 4. *Constitutional Claims*

We reject Delgado's claim that he was denied a fair trial by the court's "segregating prosecution from defense and putting the thumb wholesale on the Government's side of the scale." As discussed above, the trial court's rulings with respect to impeachment of Leslie and Delgado were, for the most part, similar. To the extent the trial court ruled Delgado, but not Leslie, could be impeached with prior misdemeanor conduct, no prejudice resulted, as Delgado was allowed to question Leslie regarding conduct which directly reflected on her credibility. The trial court did not unfairly tip the balance of the trial in favor of the prosecution.

Moreover, exclusion of evidence "of marginal impeachment value . . . does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545; *People v. Leonard*, *supra*, 228 Cal.App.4th at pp. 497-498.) "Given the ample evidence regarding [Leslie's] credibility offered at trial," Delgado has not shown that allowing additional impeachment with misdemeanor conduct "'"would have produced 'a significantly different impression of [the witness's] credibility'"'" as required to state a constitutional violation. [Citation.]" (*Leonard*, *supra*, at p. 498.)

**B.** *Exclusion of Leslie's Prior False Accusation of Rape*

In arguing that he was prejudiced by the trial court's rulings on impeachment, Delgado notes that the trial court excluded evidence that Leslie had previously "falsely accused [him] of rape."

In a pretrial motion in limine for a ruling on the admissibility of various evidence, Delgado sought admission of evidence that on October 10, 2006, "Leslie made a false accusation that [he] raped her, after an investigation the district attorney rejected filing the accusation on a lack of Leslie's credibility." It was the defense's position that this was evidence of a conspiracy between Leslie and the children to falsely accuse Delgado of sexual offenses. Defense counsel further argued, "They investigated it. They found that it had no merit. . . . As a matter of fact, they couldn't even get a hold of her. And when they did, she was with [Delgado] in court in Whittier. It was—it's just an indication of what kind of person this [Leslie] is, and I think it's very relevant . . . ." The trial court reminded defense counsel to "[k]eep in mind what I said in chambers," that "[s]he's not on trial. He is on trial."

It has been held that it is error to exclude evidence that the victim previously made false accusations of rape. (*People v. Hayes* (1992) 3 Cal.App.4th 1238, 1245; *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 597-600.) Such false accusations are "'relevant on the issue of the molest victim's credibility.' [Citation.]" (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.) Leslie was not the victim here, however; her daughters were. Thus, this case does not involve "the typical scenario of a one-on-one sexual assault, in which victim credibility is often determinative," and exclusion of a prior false accusation of rape is more likely to be an abuse of discretion. (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1425-1426.)

Moreover, Leslie's prior accusation of rape "would have no bearing on her credibility unless it was also established that [the accusation was] false. [Citation.]" (*People v. Tidwell*, *supra*, 163 Cal.App.4th at p. 1457.) Evidence Code "[s]ection 352 provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue

consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' '[A] trial court's exercise of discretion under Evidence Code section 352 will not be reversed on appeal absent a clear showing of abuse. [Citations.] It is also established that "'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense.'" [Citations.] This does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than "slight-relevancy" to the issues presented. [Citation.] . . . [Citation.] The proffered evidence must be of some competent, substantial and significant value. [Citations.]' [Citation.] A trial court's exercise of discretion under [Evidence Code] section 352 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]' [Citation.]" (*Ibid.*)

"[The d]efendant's problem in showing that the trial court abused its discretion in excluding the evidence concerning the prior rape [accusation] is that it is not readily apparent that [the prior accusation was] false." (*People v. Tidwell*, *supra*, 163 Cal.App.4th at p. 1458.) All Delgado's proffer of evidence showed was that "they"— either law enforcement or the prosecuting authorities—declined to prosecute him based on the accusation. In light of the relationship between Leslie and Delgado, that could have been based on Leslie's subsequent change of heart and refusal to cooperate just as easily as it could have been based on the falsity of the accusation. Admission of the evidence "'would in effect force the parties to present evidence concerning [a] long-past sexual incident[] which never reached the point of formal charges. Such a proceeding would consume considerable time, and divert the attention of the jury from the case at hand.' [Citation.]" (*Ibid.*) For this reason, the trial court did not abuse its discretion in excluding evidence of Leslie's prior false accusation of rape. (*Ibid.*; see also *People v. Leonard*, *supra*, 228 Cal.App.4th at p. 497.)

**C.** *Other Arguments Made by Appellant*

Delgado also complains that the trial court's ruling that his former wife, Lynette, could be impeached with her prior convictions involving moral turpitude prevented him from calling her as a witness. As a result, Delgado was precluded from impeaching L. with Lynette's testimony that she never saw Delgado hit L.

First, that Lynette never saw Delgado hit L. does not prove that he never hit her. Second, as Delgado acknowledges, the prosecution was entitled to impeach Lynette with prior convictions involving moral turpitude. (Cal. Const., art. I, § 28, subd. (f); *People v. Edwards*, *supra*, 57 Cal.4th at pp. 723-724.) It matters not that Delgado intended to ask Lynette "a single question, and elicit a single answer." We perceive no abuse of discretion in the trial court's ruling as it applied to Lynette.

Delgado also argues that "[r]estriction of Leslie's cross-examination was constitutionally noxious because it enabled the Government to portray her as a dedicated and well-meaning mother, someone who, while struggling with domestic violence and drug addiction, was nonetheless a loving parent, concerned foremost about the welfare of her children—someone who, above all else, was standing up and telling the truth for her kids."

"'A prosecutor may make "assurances regarding the apparent honesty or reliability of" a witness "based on the 'facts of [the] record and the inferences reasonably drawn therefrom.'" [Citation.]'" (*People v. Redd* (2010) 48 Cal.4th 691, 740.) Thus, the prosecutor could attempt to portray Leslie "as a dedicated and well-meaning mother," despite her admitted history of drug abuse and incarceration, multiple prior convictions, return to Delgado after claimed incidences of domestic violence, and obliviousness to the effect of Delgado's molestation on her children.

By the same token, defense counsel was entitled to argue that Leslie forced her children to lie about Delgado, and asked the jury: "Now, your question certainly is who would do this to this person here and to their children? . . . What kind of a person would do that? Now you're wondering why I got into all the felonies and taking dope and all that. Because this is the person." Defense counsel pointed out that Leslie lost custody of

her two older children due to her drug use, she gave birth to L. while in jail, she obtained false identification for A. for a trip to Las Vegas, and sustained multiple convictions during this time period.

The trial court's restriction on Leslie's impeachment did not clothe her with """"a false aura of veracity"""" (*People v. Chavez*, *supra*, 84 Cal.App.4th at p. 28) or preclude Delgado from impeaching her with her prior convictions and dishonest conduct. It was not "constitutionally noxious." (See *People v. Brown*, *supra*, 31 Cal.4th at p. 545; *People v. Leonard*, *supra*, 228 Cal.App.4th at pp. 497-498.)

## DISPOSITION

The judgment is affirmed.


BECKLOFF, J.[*]


We concur:



PERLUSS, P. J.



ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.